# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00772-CV

---

**D. D. and L. H., Appellants**

**v.**

**Texas Department of Family and Protective Services, Appellee**

---

**FROM THE 395TH DISTRICT COURT OF WILLIAMSON COUNTY**
**NO. 21-0079-CPS395, THE HONORABLE RYAN D. LARSON, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Appellants D.D. (Father) and L.H. (Mother) appeal from the district court's order, following a bench trial, terminating their parental rights to their children, ten-year-old R.D. (Son) and eight-year-old P.D. (Daughter).[1]  In three issues, Father (1) challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that he endangered the children and that termination of his parental rights was in the children's best interest and (2) asserts that the trial court abused its discretion by not appointing him the children's possessory conservator. In six issues, Mother challenges the legal and factual sufficiency of the district court's findings as to four predicate grounds for terminating her parental rights, including that she had endangered the children, as well as its finding that termination of her parental rights was in the children's best interest.  Mother also asserts that the trial court improperly based one of its

---

[1]  For the children's privacy, we refer to them and their parents by their initials and by their familial relationships to each other, and we refer to the children's approximate age at the time of trial. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

predicate ground findings on evidence that she was economically disadvantaged. We will affirm the district court's order of termination.

## BACKGROUND

In September 2021, the Texas Department of Family and Protective Services (the Department) received a report that Mother's boyfriend (Boyfriend) had an argument during which Boyfriend jumped on Mother's car and punched the windshield. When the Department's investigator went to Mother's home, Mother was in her car in the driveway and reported that she and Boyfriend had a fight over his cellphone, that she left the house to deescalate the argument, and that Boyfriend jumped on her car and punched the windshield, breaking it. The next day the Investigator interviewed Boyfriend in jail, and Boyfriend reported that Mother and he have used methamphetamine together for years. Boyfriend claimed that Mother stays up all night after taking methamphetamine, which causes the children to often be late for school. Boyfriend stated that Mother does not work and steals money from her father to buy methamphetamine. Boyfriend told the Investigator that he and Mother were having an argument, and when Mother got in her car and attempted to drive away, he jumped on her car and smashed her windshield. Boyfriend reported that Son and Daughter were present during the argument and that Son hit Boyfriend with a baseball bat after Boyfriend smashed Mother's windshield.

The Investigator attempted to contact or meet with Mother several times and finally met with her in the driveway of her home on September 30. Mother would not allow the Investigator to enter the home, and he asked her to provide an oral swab for a drug test, which she declined to do. The Investigator unsuccessfully attempted to contact or meet with Mother throughout the next two months and ultimately requested that the Williamson County Sheriff's Department conduct a welfare check. The deputy who conducted the welfare check was able to

2

make contact with Mother, Son, and Daughter at their residence. Mother did not appear to be under the influence of any illegal substances.

After continued unsuccessful efforts to meet with Mother, the Investigator contacted Father, who stated that he had no knowledge of drug use in Mother's home but that he had not been to Texas in more than two years. Father stated that at that time Boyfriend was living with Mother and that Boyfriend was using drugs.

In November 2021, the Investigator submitted a request for an Aid to Investigate to the Williamson County Attorney for the purpose of gaining access to the home that Son and Daughter lived in, access to their school records, a forensic interview of the children, and hair follicle and nail drug tests from Mother and hair follicle tests for Son and Daughter. The court authorized the Department to have investigatory access to Son and Daughter and to enter the residence. The Investigator described the home as follows:

> The home was observed to be in dismay [sic]. I observed mounds of dirty and wet clothes in multiple places inside and outside of the home, rat droppings throughout the residence, a leaking pipe in the kitchen which also had dirty clothes under it to soak the water, flies, and roaches. The mounds of clothes were extensive enough to block off areas of the home, including between the kitchen and living room to the door that led to the backyard of the home. [Mother] pointed out [Son's] sleeping area. [Son] sleeps in the living room of the home on a small mattress with a fan next to him. Piles of rat droppings were found at the foot of his sleeping area, as well as a mound of clothes about 3 feet away. [Mother] explained that she and Daughter sleep in a bedroom together. Their bedroom was observed to include another mound of clothes, as well as a small bed which she and [Daughter] were said to have been sharing.[2]

The Investigator then explained to Mother that, based on the condition of the home, the children could not continue to stay there. Son, Daughter, and Mother then went to stay with a friend of Mother's father and later moved to an undisclosed location. In December, the Investigator met

---

[2] At trial, photographs of the interior of the house were admitted into evidence and were consistent with the Investigator's description.

with Son, who stated that they were staying with Mother's friend, and Daughter, who declined to say with whom they were staying. The Investigator then went back to the family's residence to attempt to meet with Mother. Although the Investigator observed Mother looking through the blinds of the house, she did not answer the door. The Investigator then unsuccessfully attempted to call Mother and sent her a text message asking where the children were staying and why she had not completed her drug test. Mother did not reply. Two days later the Investigator sent another text message asking her to let the Department know where the children were staying and reiterated that she needed to complete a drug test. Mother did not respond.

Based on this investigation, the Department sought and obtained emergency removal of the children from Mother and filed a petition to terminate Mother's and Father's parental rights. The court appointed the Department the children's temporary sole managing conservator. The case proceeded to a two-day bench trial in October and November 2022. The witnesses included Department caseworkers, the children's Court Appointed Special Advocate (CASA), Mother, and Father. The evidence showed that Mother and Father had an extensive history with the Department. The Department first investigated Mother and Father in 2017 when there were concerns about domestic violence between Mother and Father. Mother reported that Father, on more than one occasion, sexually assaulted her while she was sleeping. Mother also reported that one incident of domestic violence occurred when she was holding Daughter. The Department spoke to Mother on the phone, but she declined all subsequent calls and the case was not pursued. In 2019, the Department received information that Mother and Father were using methamphetamines. The Department alleged that Father had a history of methamphetamine use and was involved in a car accident when he was under the influence of methamphetamine with Son in the vehicle. Due to lack of cooperation by Mother and Father, the case was resolved as

4

"unable to determine." In January 2021, the Department received a report about lack of food in the home where Mother, Boyfriend, and the children were living. At that time, the Department discovered a used and dirty hypodermic needle lodged in Son's facemask. Due to Mother's refusal to cooperate or communicate with the Department despite its efforts to do so for five months, the case was resolved as "unable to determine." Then, in September 2021, the Department received the report of domestic violence between Mother and Boyfriend during which Boyfriend smashed the windshield of Mother's car while she was in the vehicle in the driveway of their home.

A Department caseworker, Zachary Gassett, testified that the Department received a report of domestic violence between Mother and Boyfriend in September 2021. Mother and Boyfriend had been arguing, Mother locked herself in her car in the driveway, and Boyfriend jumped on the car and smashed the windshield with his fist. During the argument, Son came out of the house and struck Boyfriend with a baseball bat. Mother then left the home, leaving the children with her father, who resided there as well. Gassett stated that Mother reported that she was not concerned about Son and Daughter's exposure to this type of behavior between her and Boyfriend. The Department then created a safety plan for Mother due to the condition of the home and concerns about Mother's and Boyfriend's drug use. After the incident with the smashed windshield, Boyfriend was incarcerated on a charge of criminal mischief. The Department did not remove the children immediately from Mother's care because Boyfriend was not present and the Department wanted to give Mother a chance to do services and take a drug test. When he was released from jail, the Department determined that it was necessary to remove the children from Mother's care. The Department was concerned not only about the domestic violence between Mother and Boyfriend but also about the condition of the home. Additionally,

5

Mother's hair follicle drug test was positive for methamphetamine. In December 2021 the Department sought to be, and was, appointed the children's Temporary Managing Conservator.

Department caseworker Evangeline Hill testified about Mother's failure to complete her service plan and repeated failures to submit to requested drug testing. Although Mother completed an Outreach, Screening, Assessment, and Referral (OSAR) program, she did not take protective parenting or domestic violence classes and did not undergo a psychiatric evaluation. Mother tested negative on a March 2022 urine drug test but failed to submit to weekly requested urine tests thereafter or to submit to hair follicle or nail drug tests. Mother reported that she did not trust the lab's medical analyst so she did not submit to the testing. Mother also told Hill that she could not obtain transportation to the drug testing facility, but Hill testified that the Department offered Mother transportation that she declined. Although Mother met with a therapist in May 2022, she was discharged by the therapist for failing to attend the therapy sessions. Mother recommenced therapy sessions in August but was again discharged from therapy for failure to attend sessions. Hill testified that at the sessions she did attend, Mother mostly complained about the Department's involvement and was unable to talk about the things she needed to do or how to resolve the issues that had led to the Department's removal of the children from her care. Mother also failed to attend a Trust Based Relational Intervention course designed to train caregivers to provide effective support and treatment for at-risk children. Although Mother told Hill that she did not attend services and submit to drug tests because she lacked transportation, Hill testified that the Department had made repeated efforts to offer and coordinate transportation for Mother.

Hill testified that Mother was often uncommunicative to her about where she was living and did not respond to texts or emails Hill sent her regarding services and drug testing.

6

Regarding Mother's visits with Son and Daughter, Hill testified that Mother originally had weekly, one-hour visits, which were virtual because the children were living in Corpus Christi with their paternal grandparents. In February 2021, the visits were shortened to thirty minutes because of the children's short attention spans. The Department offered to transport Mother to Corpus Christi for in-person visits but had difficulty contacting her to discuss transportation. Hill recounted one instance in which Mother planned to drive to Corpus Christi for a two-hour visit on Daughter's birthday but left Austin so late and made stops on the road that caused her to arrive in Corpus Christi too late for the visit. Hill stated that she received positive reports about the visits that did occur.

Hill testified that Mother has not been able to prioritize her children and has not demonstrated that their needs are a priority. Although the Department had requested that Boyfriend also do services, Mother expressed her view that the case had nothing to do with Boyfriend and that "she was tired of people asking about" him. Hill testified that she tried to explain to Mother that since she continued to be in a relationship with Boyfriend; and, because the Department's involvement was due in part to that relationship, it was important for Boyfriend also to participate in services.

Hill testified that Father had been ordered to take basic parenting classes, participate in individual therapy, undergo a psychological evaluation and a substance abuse evaluation, participate in domestic violence counseling, and submit to drug testing. Father did not submit to drug testing and gave as the reason that he had already advised the Department that he uses marijuana daily. Father participated in some services, attended most scheduled weekly telephone visits with the children, and underwent a psychological evaluation. Hill testified that

7

Father maintains, however, that he should not have to do any services and was not involved in the events resulting in the children's removal from Mother's care.

Mother testified about the event that led to the removal of Son and Daughter from her care—the argument with Boyfriend during which her car windshield was smashed. Mother stated that the argument started in the house and that she went out to her car because she did not want to argue in front of Son and Daughter. Mother stated that she locked herself in the car because she wanted to smoke a cigarette without Boyfriend's bothering her, not because she was afraid of Boyfriend. Mother testified that Boyfriend did not punch the car windshield but, rather, tapped on it to get her attention. Mother stated that the windshield was broken when Boyfriend tapped the window and his metal ring hit it. Mother testified that she was not frightened when the windshield broke, just surprised. Mother then called her father, who was inside the house, and reported what had happened. Son then came out of the house and hit Boyfriend on the back of his legs with a baseball bat. Mother stated that Son had been told since he was three years old that he was the "man of the house" and "took that seriously," which was why he felt he needed to protect Mother from Boyfriend when he saw the smashed windshield. Mother testified that she called the police, and Boyfriend was charged with criminal mischief and spent 30 days in jail. Mother stated that she did not seek a protective order and that the only reason she had pressed charges was to show Son and Daughter that Boyfriend's behavior was "unacceptable." Mother testified that although she made a statement to the police that Boyfriend had jumped on her car and punched her windshield, on reflection she "has a different recollection of what happened" and at the time "was angry" and "had a lot going on in the moment."[3] Mother and Boyfriend continue to be in a relationship. Mother testified that she does not believe that Boyfriend

_____

[3] Boyfriend testified at trial that he did not punch the windshield and that it shattered when he tapped it with his ring. According to him the whole incident has been "misunderstood."

should have to do services because she believes the children are safe with him, that they are comforted by him, and that Boyfriend adores the children and is very nurturing of them. Mother testified that the only time there are domestic disputes between her and Boyfriend are during "times of stress."

Mother testified that she tested positive for methamphetamine in January 2022 and had not submitted hair or nails for drug testing from January through October 2022. Mother stated that transportation issues prevented her from submitting urine samples. Mother stated that transportation issues also prevented her from attending court hearings. She stated that after moving out of her father's home, which he sold, she had been living in multiple places, mostly with friends. Mother stated that she had been working minimally and that her father had purchased an RV that she could stay in with the children if they were returned to her. She stated that she could support the children with a job, child support from Father, and her father's help and that because she "did it for eight years before" she could "figure it out now." Mother testified that she wants to have her children back with her and that she has never done anything to put them in danger. Mother stated that the only complaints from the Department had been about Boyfriend and Father.

When asked about Father, Mother testified that she had been in a relationship with him from 2010 to 2016. Toward the end of the relationship, Mother and Father had domestic violence issues, which she attributed to his drug use. Mother testified that she stayed with Father despite the domestic violence because they "had been together a long time" and there was never physical aggression between them until they moved to Corpus Christi when "everything changed." Mother stated that at that time she told Father to move out because of domestic violence between them, which he did. Mother stated that she believed Father would benefit from

9

anger management counseling. Mother testified that she believes Father is a good parent and that he has done nothing to warrant termination of his parental rights. Regarding Boyfriend, Mother testified that Father does not like him and thinks she "deserves better." Although Mother denied that Father's disapproval was due to domestic violence between Mother and Boyfriend, she testified that Father told Mother he does not want the children to be around her and Boyfriend when they are fighting.

Father testified at trial that he has lived in Kansas for the past several years, works as a delivery driver for a pizza restaurant and lives in a house with his cousin. Father stated that he was not currently in a position to have the children live with him although he believed he was "slowly getting there." Father has not seen the children since May 2018 but, since the Department's involvement, had been participating in regular video or phone calls until he stopped doing that because he felt he was "losing a grip on what was going on." Father testified that he uses marijuana daily and that he suffers from anxiety, headaches, and memory loss due to injuries from an automobile accident. Father stated that he cannot afford to see a therapist or a psychiatrist. He also stated that he did not intend to do the services ordered by the court because he does not believe he did anything wrong. Regarding Mother, Father testified that when they were together they used drugs and there had been an incident of domestic violence. Father expressed concern about domestic violence between Mother and Boyfriend, which he had been aware of for years. Father stated that he had a low opinion of Boyfriend and believed that the fighting between Boyfriend and Mother was more than "just a normal couple's disputes." Father expressed his belief that the children should not be returned to Mother because of her unstable housing situation, the fact that she lives with Boyfriend, does not have a job, and has failed to submit to drug testing. Father testified that he was alarmed to learn that the children had missed

10

school and were not able to read but could not do anything about it because of his distance from them. Father stated that child support payments had regularly been deducted from his paycheck and that he would have no problem with those payments being directed to whomever is caring for the children. Father testified that although he would like to be part of the children's lives, he does not presently have the resources to do so. Father stated that he feels that he has abandoned the children, but that he has done all that he could "under the circumstances."

Mickey Rowland, the Court Appointed Special Advocate, testified extensively about Son and Daughter. Rowland began working with the children in February 2022 and visited them monthly. She transported them to therapy, went on trips with them to the park, and took them out to eat. Rowland stated that when Son was in third grade he could read only ten out of 100 kindergarten-level sight words and had excessive unexcused absences from school. Since the Department's involvement, Son has made significant progress in learning to read. Daughter was also behind in school. Since the Department's involvement she has repeated second grade and is doing "fantastic." Rowland stated that both Son and Daughter are very proud of their grades and love school.

Rowland testified that Son is very protective of and "adult-like" with Daughter. Over time, however, Son has been more able to "be a kid" and is less focused on caring for Daughter. Son's outward appearance has changed and he is now well-dressed, has a good haircut, and good hygiene. Rowland stated that Son seems proud of himself. Son is more communicative and less reluctant to share and has let go of some responsibilities he felt he had that were not appropriate for a child his age. Rowland described Son as more "at peace." Rowland testified that Daughter has changed over the past year. She has become very communicative and "laughs a lot." According to Rowland she "has a spark in her eye whereas

previously she was dull," has "come to life," and is making friends and enjoys Taekwondo and cheer classes.

Rowland stated that Son and Daughter currently live with the Aunt and Uncle in McDade where they are very happy. Son is saving money to buy a guitar and he and Uncle built a skate board ramp together. The McDade Aunt and Uncle are not able to keep the children very much longer, so the Department's plan is for them to go to live with another maternal aunt and uncle who live in Utah. The Utah Aunt and Uncle are eager to adopt the children and, in anticipation of a move to Utah, they have had regular video calls. During her testimony, Hill stated that the Utah Aunt and Uncle are prepared to take care of the children. They have an adoptive special needs child who is 14, and Aunt has training in trauma-informed care. The Utah Aunt and Uncle have stated that they would be open to Mother and Father having access to the children so long as they are "clean and appropriate." Rowland testified that the children get excited talking to their therapist about moving to Utah and they talk about the virtual visits with Aunt and Uncle. Rowland testified that the children have been made a priority by the McDade Aunt and Uncle and are now experiencing a healthy family dynamic. They have regular bedtimes and meals, do their homework, and go to school every day on time. Rowland stated that the children improve every day and that adoption by Utah Aunt and Uncle would provide them the permanency they need to continue to blossom and thrive.

Rowland testified that, as CASA, her position is that Mother's and Father's parental rights should be terminated. Although Son and Daughter both miss Mother and have expressed a desire to return to living with her, Son has also stated that if Boyfriend were there he would "punch him in the mouth and tackle him." Rowland also described the children's emotional state after visits with Mother—Son often gets angry, which is unusual for him, and

Daughter often cries. Rowland recounted that the therapist noted that when the children had not had a visit with Mother for two weeks it was "calming to them." Rowland testified that she knows that Son and Daughter love their Mother, but that she has not made her children a priority or parented them in an appropriate way. As an example, Rowland recounted that when they were living with Mother, Son and Daughter would go to neighbors' houses asking for food and that Son mowed lawns and gave the money to Mother. Rowland testified that it would be detrimental to the children's physical and emotional well-being to return to those circumstances.

Regarding Father, Rowland testified that he has been forthright in telling her he cannot provide for them financially. Rowland also expressed concern about the history of domestic violence between Father and Mother, about Father's drug use, and about his refusal to do services because he thinks he has done nothing wrong. Although Father started having contact with the children after the Department's involvement, he was not doing that before, and Rowland did not believe that a relationship with Father was necessary for Son and Daughter to be happy and successful.

Rowland testified that termination of Mother's and Father's parental rights was in the children's best interest because it would allow them to have the permanency of adoption, most likely by the Utah Aunt and Uncle. In Rowland's opinion, Mother's and Father's focus throughout the past year has not been on the children and on what they need to do to get them back but, instead, they have been angry and indignant at what the Department has asked them to do and they do not see the reason or justification for it. Rowland expressed concern that Mother and Father have continued to say that they have done nothing wrong when it is apparent to her that the children were struggling emotionally, educationally, and mentally. Rowland stated that

throughout the case Mother and Father have focused on the injustice they feel and not on what they need to learn or do to be protective parents for the children.

At the conclusion of the bench trial, the district court found by clear and convincing evidence that Mother and Father had: (1) knowingly placed or knowingly allowed the children to remain in conditions and surroundings which endangered their physical and emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical and emotional well-being; (3) failed to comply with the provisions of a court order that specifically established the actions necessary for them to obtain the return of the children; and (4) used a controlled substance in a manner that endangered the health and safety of the children and failed to complete a court-ordered substance abuse treatment program or, after completion of a court-ordered substance abuse treatment program, continued to abuse a controlled substance. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), (P). The district court also found by clear and convincing evidence that termination of Mother's and Father's parental rights was in the best interest of the children. *See id.* § 161.001(b)(2). The district court signed findings of fact and conclusions of law and an order terminating Mother's and Father's parental rights. This appeal followed.

## STANDARD OF REVIEW

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the child's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship

14

implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007); *Holick*, 685 S.W.2d at 20. "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *A.C.*, 560 S.W.3d at 630.

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or

conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

### DISCUSSION

**Statutory grounds—Mother**

In her first four issues, Mother challenges the legal sufficiency of the evidence to support each of the trial court's four predicate-ground findings, but we limit our review to Mother's first two issues in which she challenges the legal sufficiency of the evidence to support the district court's endangerment findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E); *In re N.G.*, 577 S.W.3d at 232-33, 237 (explaining that only one predicate ground is necessary to support termination of parental rights when there is also best interest finding but requiring appellate court to detail analysis for appeal challenging subsection (D) or (E) findings). Mother argues that, because she "did not have enough help with services," the evidence was legally

16

insufficient to support termination of her parental rights under either subsection (D) or (E). Mother maintains that the incident when Boyfriend jumped on her car and smashed her windshield only resulted in a criminal mischief charge and criminal mischief is "not necessarily an endangering condition." The remainder of Mother's argument principally centers around justifications for her failure to complete services or complete drug testing, which include her assertion that the Department failed to adequately explain the service plan to her and that she was unable to communicate with her caseworker. Finally, Mother asserts that evidence that she tested positive for drugs is legally insufficient to support an endangerment finding.

Endangerment means exposing a child to loss or injury or jeopardizing a child's emotional or physical well-being. *See Texas Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.C.*, 577 S.W.3d at 698-99. A finding of endangerment requires more than the threat of metaphysical injury or possible ill effects from a less-than-ideal family environment, but the Department does not have to prove that the conduct was directed at the child or that the child suffered an actual injury. *See In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *A.C.*, 577 S.W.3d at 699. Moreover, when parents injure or harm one of their children, a factfinder may infer the parents have endangered their other children. *See In re E.A.K.*, 192 S.W.3d 133, 151 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Subsection (D) authorizes termination of parental rights if clear and convincing evidence establishes that the parent has "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(D). Subsection (E) authorizes termination of parental rights if clear and convincing evidence establishes that the parent "engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(b)(1)(E). Although

17

both grounds require proof of endangerment, they are otherwise separate and distinct grounds. *See A.S. v. Texas Dep't of Fam. & Protective Servs.*, 394 S.W.3d 703, 713 (Tex. App.—El Paso 2012, no pet.); *In re S.H.A.*, 728 S.W.2d 73, 85 (Tex. App.—Dallas 1987, writ ref'd n.r.e.); *see also In re J.K.N.G.*, No. 04-21-00310-CV, 2022 WL 689095, at *5 (Tex. App.—San Antonio Mar. 9, 2022, pet. denied) (mem. op.).

The primary distinction between subsections (D) and (E) is the cause of the endangerment to the child's physical or emotional well-being. *S.H.A.*, 728 S.W.2d at 85. Under subsection (D), the focus is on "conditions or surroundings" that endanger the child, while under subsection (E), the focus is on "conduct" that endangers the child. *Id.* Moreover, "[a] single act or omission can support termination under subsection (D)," *J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 524 (Tex. App.—Austin 2019, no pet.), while "termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required." *C.B. v. Texas Dep't of Fam. & Protective Servs.*, 458 S.W.3d 576, 582 (Tex. App.—El Paso 2014, pet. denied).

Also, subsection (D) always requires proof of scienter, i.e., evidence that parents "knowingly" placed or "knowingly" allowed their children to remain in endangering conditions or surroundings. *See In re T.H.*, 131 S.W.3d 598, 603 (Tex. App.—Texarkana 2004, pet. denied); *cf. In re I.D.G.*, 579 S.W.3d 842, 851 (Tex. App.—El Paso 2019, pet. denied) ("Scienter is not required for appellant's own acts under Section 161.001(b)(1)(E), although it is required when a parent places her child with others who engage in endangering acts."). "Subsection D is not a basis for terminating parental rights if the parent was unaware of the endangering environment." *In re A.L.H.*, 468 S.W.3d 738, 746 (Tex. App.—Houston [14th Dist.] 2015, no pet.). "So, in scrutinizing the endangerment finding, we focus not only on evidence of

18

endangerment but also on evidence showing the parent's awareness of the endangering environment." *In re J.E.M.M.*, 532 S.W.3d 874, 881 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Because the evidence pertaining to subsections (D) and (E) is otherwise interrelated, we consolidate our review of the evidence. *See J.M. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-21-00274-CV, 2021 WL 5225432, at *5 (Tex. App.—Austin Nov. 10, 2021, pet. denied) (mem. op.).

"Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). Evidence of incidences of domestic violence between both Mother and Father and Mother and Boyfriend was presented at trial. Hill and Gassett testified about their concerns about domestic violence that had occurred in the children's presence and its detrimental effect on Son, who responded to Boyfriend's smashing Mother's windshield by hitting him with a baseball bat. *See In re M.R.*, 243 S.W.3d 807, 818-19 (Tex. App.—Fort Worth 2007, no pet.) (holding that evidence of exposing child to domestic violence supports an endangerment finding under subsections (D) and (E)). Moreover, during their testimony Mother and Boyfriend both minimized the incident involving the smashed windshield. Although Mother initially reported to police that Boyfriend had jumped on her car and punched the windshield, causing her to pursue criminal charges, at trial she and Boyfriend testified that the windshield shattered after Boyfriend tapped it with his ring to get her attention.

A parent's drug use can also constitute a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see also M.D. v. Texas Dep't of Fam. & Protective Servs.*, No 03-20-00531-CV, 2021 WL 1704258, at *8 (Tex. App.—Austin Apr. 30,

2021, no pet.) (mem. op.) (explaining that drug use may support termination under subsection (E) "because it exposes the child to the possibility that the parent may be impaired or imprisoned"). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Cervantes-Peterson v. Texas Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253-54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc). Testimony that Mother used methamphetamine during her relationships with both Father and Boyfriend was presented at trial. In January 2021, the month after the children were removed from her care, Mother had a positive drug test for methamphetamine. Mother also refused to take many drug tests in the year preceding the bench trial, which supports an inference by the factfinder that the parent was using drugs. *See, e.g.*, *In re E.M.*, 494 S.W.3d 209, 222 (Tex. App.—Waco 2015, pet. denied); *In re C.A.B.*, 289 S.W.3d at 885; *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.).

The Department's caseworkers testified about their concerns that Mother was not participating in court-ordered services. A parent's efforts to improve or enhance parenting skills are relevant in determining whether a parent's conduct results in endangerment under subsection (E). *See In re D.T.*, 34 S.W.3d 625, 640 (Tex. App.—Fort Worth 2000, pet. denied). Failure to maintain stability endangers the child's physical and emotional well-being. *See In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014). Evidence at trial showed that Mother did not complete her court-ordered services. Although Mother testified that her failure to complete services was due to the Department's failure to adequately explain them or help her complete them, a Department caseworker testified that she had explained the service plan to Mother, that Mother acknowledged that she understood it, and

that the Department had worked diligently to set up services for Mother both in Austin and Corpus Christi, depending on where Mother was living. The caseworker testified that Mother was uncommunicative and difficult to contact. Both the caseworker and the CASA expressed concern that Mother was not prioritizing her children and was not committed to doing what she needed to do to obtain reunification with the children. Instead, Mother focused on the "injustice" she felt about the Department's involvement.

Viewing the evidence under the applicable standard of review, we conclude that the evidence was legally sufficient to support the trial court's findings under subsections (D) and (E). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Thus, we overrule Mother's first and second issues and do not reach her third or fourth issues addressing subsections (O) and (P). *See In re N.G.*, 577 S.W.3d at 232-33.[4]

**Statutory grounds—Father**

In his first issue, Father challenges the legal and factual sufficiency of the evidence to support the trial court's endangerment findings. *See* Tex. Fam. Code § 161.001(b)(1)(D), (E). Father argues that there was no evidence that he was aware of any danger posed to the children by Mother and Boyfriend because, although he knew that they argued, he did not know that their arguments involved physical altercations. Father asserts that he did not know that Mother tested positive for methamphetamine until after the children were removed from Mother's care by the Department.

---

[4] In her fifth issue, Mother asserts that the district court improperly relied on evidence of economic disadvantage in making its predicate-ground findings. *See* Tex. Fam. Code § 161.001(c)(2) (prohibiting court from making a subsection (b) finding based on evidence that parent is economically disadvantaged). The evidence outlined in this section supporting the (D) and (E) findings demonstrates that the trial court's finding was not based on Mother's economic circumstances. We overrule Mother's fifth issue.

"Although 'endanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). "Endangerment does not have to be established as an independent proposition, but can be inferred from parental misconduct alone," and courts may look to conduct "before the child's birth and both before and after the child has been removed by the Department." *Pruitt v. Texas Dep't of Fam. & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *4 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.). "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d at 845. At trial, Mother testified about domestic violence between her and Father toward the end of their relationship, which she attributed to his drug use. Mother testified that she remained in a relationship with Father despite the domestic violence because they "had been together a long time." Mother testified that Father could benefit from anger management. Father also testified that there was at least one incident of domestic violence between him and Mother.

A parent's drug use can also qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See In re C.A.B.*, 289 S.W.3d at 885. Mother and Father testified that he used drugs when he was living with Mother and the children, and Father testified that he uses marijuana daily. *See In re M.D.*, 2021 WL 1704258, at *8 (explaining that drug use may support termination under subsection (E) "because it exposes the child to the possibility that the parent may be impaired or imprisoned.").

Regarding Mother and Boyfriend's relationship, although Father testified that he did not realize that their arguments involved physical altercations, Father testified that he had

22

told Mother many times that he did not want Boyfriend around the children, that he had a low opinion of Boyfriend, and that Boyfriend "had trouble written all over him." Father testified that he had known for years that Mother and Boyfriend frequently fought, that he was not happy about it, and that he believed their arguments to be "more than just a normal couple's disputes." The CASA testified that she was very concerned that Father was aware of the circumstances that Son and Daughter were living in and did not do anything. Father himself testified that he felt that he had abandoned his children but believed that he had done all that he could "under the circumstances."

Viewing the evidence under the applicable standards of review, we conclude that the evidence was legally and factually sufficient to support the trial court's findings under subsections (D) and (E). *See* Tex. Fam. Code § 161.001(b)(1)(D), (E).

**Best Interest**

Mother, in her sixth issue, and Father in his second issue, challenge the legal and factual sufficiency of the evidence supporting the trial court's determination that termination of their parental rights was in the children's best interest. We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d at 807; *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors

must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence [was] undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. Evidence presented to satisfy the predicate-ground finding may also be probative of the child's best interest. *See id.* at 27-28; *Pruitt*, 2010 WL 5463861, at *7.

The children testified that they would like to return to live with Mother. However, both Daughter and Son had ambivalent feelings about Boyfriend and expressed reluctance about living with Mother if Boyfriend was there. Neither one of the children expressed any desire to live with Father, and Father himself testified that he was "not ready" to have them live with him, although he hoped to be at some point in the future.

The proposed placement for the children is with the Utah Aunt and Uncle, who expressed their desire to adopt both children. There was testimony that the children are enthusiastic and excited about their video visits with the Utah Aunt and Uncle. The Department caseworker testified that the Utah Aunt and Uncle are prepared to care for the children and that Aunt has training in trauma-informed care. They have expressed their willingness to allow Mother and Father to continue to have contact with the children so long as they are "clean and appropriate" with them.

Regarding Mother's parenting abilities, there was ample testimony that, although Mother loves her children, she has been unable to make them a priority. Evidence from the Department's witnesses, as well as from Mother herself, showed her tendency to downplay the seriousness of the domestic violence between her and Boyfriend and its impact on the children. The Department's witnesses testified that Son has felt a level of responsibility for himself,

24

Daughter, and Mother that is inappropriate for his age. Testimony showed that the children and Mother lived in a house that was unsanitary; photographs of the home that were admitted into evidence at trial demonstrated that the house was filled with piles of clothes and toys, the kitchen sink was full of unwashed dishes, and there were rodent feces in various places, including next to Son's sleeping area. Moreover, Mother tested positive for drugs and refused to take drug tests requested by the Department. Father had not seen the children in approximately four years and there was no testimony as to his parenting abilities but, when he was living with Mother and the children, he used drugs and the couple had at least one incident of domestic violence. Father testified that he continues to use drugs and admitted that he felt that he had abandoned his children.

The Department witnesses testified that the children have not been made a priority by Mother, that Daughter was emotionally shut down, and that Son felt responsible for both Daughter and Mother. Since the Department's involvement, Daughter has "blossomed" and Son is more "at peace." Both children have begun attending school regularly, have improved their reading skills, and have been doing very well in school. Both children are proud of themselves and their achievements and love school. The CASA attributed this improvement to the stability of their foster parents and the attention and encouragement they have received. The CASA testified that both children need to continue to be in that type of environment to continue to grow and improve and that returning the children to Mother would be detrimental to their emotional well-being.

Evidence at trial showed that Mother did not make her children a priority before or after their removal from her care, the children were often absent from school or tardy and were behind in their reading ability, and Mother and Boyfriend argued and fought in front of the

25

children and both used drugs. Mother completed some, but not all, of the family service plan, and the Department's witnesses testified that Mother was more focused on the "injustice" of the Department's involvement than on doing what she needed to do to improve her life and her parenting abilities. Mother also continued to be in a relationship with Boyfriend, which concerned the Department because of his drug use, the history of domestic violence between the two, and his unwillingness to complete the services in which the Department asked him to participate. Father had essentially no contact with the children in the years preceding the Department's involvement. When Father was living with Mother and the children, he and Mother were both using drugs, and Father continues to use drugs daily.

Viewing the evidence in the light most favorable to the district court's finding, we conclude that a reasonable factfinder could form a firm belief or conviction that termination of Mother's and Father's parental rights was in the best interest of the children. Accordingly, the evidence is legally sufficient to support the best-interest finding. Similarly, we are unable to say that the evidence contrary to the finding is "so significant that the factfinder could not have formed a firm belief or conviction" that termination of Mother's and Father's parental rights was in the best interest of the children. Accordingly, the evidence is also factually sufficient to support the finding. We overrule Mother's sixth issue and Father's second issue.

**Conservatorship**

In his third issue, Father asserts that the trial court abused its discretion by not appointing him as a possessory conservator of the children. When a parent is not appointed as a sole or joint managing conservator, Texas Family Code section 153.191 requires trial courts to appoint the parent as a possessory conservator "unless it finds that the appointment is not in the best interest of the child and that parental possession or access would endanger the physical or

26

emotional welfare of the child." *See* Tex. Fam. Code § 153.191. Section 153.191, however, only applies to parents, and we have overruled Father's challenges to the trial court's decree terminating his parental rights to the children. *See* Tex. Fam. Code § 101.024(a) (stating "parent," as used in Family Code, "does not include a parent as to whom the parent-child relationship has been terminated"); *see also id.* § 161.206(b) (stating generally that "an order terminating the parent-child relationship divests the parent and the child of all legal rights and duties with respect to each other"); *Z.A.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 14-20-00511-CV, 2020 WL 7866800, at *15 (Tex. App.—Houston [14th Dist.] Dec. 31, 2020, pet. denied) (mem. op.) (overruling mother's argument that trial court erred by not appointing her as child's possessory conservator, noting that section 153.191 applies only to "a parent" and Mother's parental rights had been terminated by the trial court). We overrule Father's third issue.

### CONCLUSION

We affirm the trial court's order of termination.

_____

Thomas J. Baker, Justice

Before Justices Baker, Smith, and Jones[*]

Affirmed

Filed: April 27, 2023

[*]Before J. Woodfin Jones, Chief Justice (Retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code § 74.003(b).